1  **WO**                                                                    .

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF ARIZONA

8

9   Greer Coalition, Inc., and the Center for)   No. CV 06-0368-PHX-MHM
    Biological Diversity,                    )
10                                           )   **ORDER**
                   Plaintiffs,               )
11                                           )
    vs.                                      )
12                                           )
                                             )
13  U.S. Forest Service; Dale Bosworth, in his)
    Official Capacity as Chief of the U.S.)
14  Forest Service; Gloria Manning, in her)
    official capacity as Appeal Deciding)
15  Officer; and H. Wayne Thornton, in his)
    official capacity as Director of Lands and)
16  Minerals, Southwestern Region of United)
    States Forest Service                    )
17                                           )
                   Defendants.               )
18                                           )

19  _____

20      Currently before the Court is Plaintiffs Greer Coalition, Inc., and the Center for Biological

21  Diversity's ("Plaintiffs") Motion for Summary Judgment (Dkt.#15) and Defendants U.S.

22  Forest Service, Dale Bosworth, Gloria Manning and H. Wayne Thorton's (collectively

23  "Defendants" or "Forest Service") Cross-Motion for Summary Judgment. (Dkt.#23-2). After

24  reviewing the pleadings, and holding oral argument on December 20, 2006, the Court issues

    the following Order.
25
    **I.       Procedural Background**
26
        On February 1, 2006, the Plaintiffs filed their Complaint in this Court seeking declaratory
27
    and injunctive relief against Defendants for violations of the National Environmental Policy
28

1   Act, 42 U.S.C. § 4231, *et seq*. ("NEPA") and the Federal Land Policy and Management Act,

2   43 U.S.C. § 1701, *et seq*. ("FLPMA"). (Dkt.#3).  Plaintiffs claims arise out of the approval

3   by the U.S. Forest Service on October 14, 2005 of a land exchange of 337 acres of federal

4   land north of Greer, Arizona for approximately 400 acres of private land in Apache and

5   Greenlee counties, Arizona. (Complaint ("Compl.") ¶2).  The exchange is referred to as the

6   Black River Land Exchange. ("BRLE"). (Id.).  Plaintiffs allege that the Defendants violated

7   certain provisions of NEPA and FLPMA and seek specific relief that requires the Defendants

8   to: (1) stop the land exchange before it is finalized and (2) prohibit the land exchange until

9   the Defendants have fully complied with the requirements of NEPA and FLPMA.  (Id.¶4).

10  On February 2, 2006, the Parties entered into a stipulation whereby the Defendants agreed

11  not to finalize the BRLE until 10 days after this Court's decision on the merits. (Dkt.#4).  On

12  February 15, 2006, the Parties entered into another stipulation as to the briefing of the

13  dispositive motions in this case.  (Dkt.#7). The Parties have both moved for summary

14  judgment on the claims asserted by Plaintiffs and the motions are fully briefed and ripe for

15  this Court's consideration.

16  **II.        Factual Background**

17      As mentioned above, the U.S. Forest Service approved the BRLE, which will result in the

18  U.S. Forest Service acquiring approximately 400 acres of non-federal land in exchange for

19  approximately 337 acres of federal land. (Administrative Record, ("AR") 189).  The other

20  exchanging party and current owner of the non-federal lands is Mr. Herbert Owens. (Id.).

21  The non-federal land consists of three parcels within the Apache National Forest. (AR 187,

22  189).  The three parcels are referred to as: (1) the Thompson Ranch parcel ; (2) the Rancho

23  Alegre parcel; and (3) the Blue River Ranch parcel. (Id.).  These non-federal parcels contain

24  special features such as critical species habitat and perennially flowing surface waters. (AR

25  187).  Approximately 118 acres of the non-federal land is classified as being wetland/riparian

26  habitat. (Tr. 189).  In addition, "[a]ll three parcels contain vital species habitat including

27  loach minnow, spikedace, Apache trout, Arizona willow, Chiricahua dock, northern water

28  shrew, and native fresh mussel.  This habitat is considered extremely important on the Forest

1   and in the Southwestern Region." (Id. at 3-4).  The Thompson Ranch parcel includes the

2   historic Thompson Cabin, which is a "well recognized landmark and its picture has been

3   featured in photographic publications." (AR 187, at 20).  The Rancho Alegre parcel is

4   relatively undeveloped and contains a section of the West Fork of the Black River. (Id). The

5   Blue River Ranch parcel is "representative of the cotton-wood willow vegetative type with

6   a section of the Blue River running through it."  (Id.).  All three parcels of the non-federal

7   lands are considered scenic.  (Id. at 1).  The 337 acres of federal land being conveyed are

8   located north of Greer, Arizona and consist of two parcels - Tract A and Tract B.  The federal

9   land is part of the Apache-Sitgreaves National Forest and fronts Highway 373, the main road

10  in Greer, Arizona.  The federal land contains no riparian or wetlands habitat. (AR 189 at 5).

11  Tract A consists of a scattered overstory of second growth ponderosa pine with an understory

12  of various grasses and small openings. (Id.).  Tract B is primarily a continuous overstory of

13  second growth ponderosa pine with a grass understory. (Id.).  The federal lands are not

14  considered critical habitat or a high use area for sensitive wildlife species.  (Id. at 8).

15      Mr. Owens and the Forest Service began discussions regarding the BRLE in 1998 and in

16  December of 2000, Mr. Owens submitted a formal proposal to the Forest Service to exchange

17  the land. (AR 8).  Mr. Owens previously acquired the non-federal land in the hopes of

18  exchanging it for federal land.  (AR 5,6).  The Forest Service first notified the public of the

19  proposed land exchange in October of 2002. (AR 48).  On November 14, 2002, the Forest

20  Service and Mr. Owens executed a nonbinding agreement to initiate the BRLE. (AR 39).  In

21  May of 2003, the Forest Service issued an Environmental Assessment (EA I) and held a 30-

22  day public comment period. (AR 91,92).  After consideration of the public comments, the

23  Forest Service issued a Decision Notice (DN I) and Finding of No Significant Impact

24  (FONSI I) on August 24, 2004, authorizing the BRLE. (AR 128).  The DN I was appealed

25  by the Plaintiffs in this case on October 21, 2004 and on December 6, 2004 the appeal officer

26  reversed.  (AR 144).  Specifically, the appeal officer found three flaws with EA I of DN I:

27  (1) the cumulative effects analysis was flawed in that it did not consistently consider the

28  potential for development of the federal lands once conveyed into private ownership as a

1   reasonably foreseeable future action; (2) the Deed Restriction alternative was inappropriately

2   dismissed; and (3) the potential for reasonably foreseeable development on Federal lands was

3   not considered. (Id.).   The reviewing officer directed that the required environmental

4   assessment of the BRLE be conducted in a timely manner. (Id).  In April of 2005, the Forest

5   Service issued a revised environmental assessment (EA II) and another 30-day comment

6   period was held. (AR 166).  A public meeting was also held in the Greer community on April

7   23, 2005. (AR 169).   On or about October 14, 2005, the Forest Service issued another

8   Decision Notice (DN II) approving the BRLE and finding of No Significant Impact (FONSI

9   II).  DN II and FONSI II were published on October 14, 2005. (AR 187).  The decision was

10  signed by the Southwestern Region Director of Lands and Minerals H. Wayne Thornton.

11  (AR 189).  Plaintiffs again appealed the decision on December 8, 2005. (AR 211).   On

12  January 23, 2006, the reviewing officer, Ms. Gloria Manning, affirmed the ruling. (AR 224).

13  Ms. Manning rejected the Plaintiffs challenges by noting that "the requirements of the

14  National Environmental Policy Act and the Federal Land Policy and Management Act ...

15  were met by the DN/FONSI and EA." (Id.).  Plaintiffs instituted the present action in this

16  Court challenging the ruling with their Complaint on February 1, 2006. (Dkt.#3).

17  **III.        Standard of Review**

18     "A party alleging violations of NEPA and FLPMA can bring an action under the

19  [Administrative Procedures Act] APA challenging an 'agency action.'" ONRC Action v.

20  Bureau of Land Management, 150 F.3d 1132, 1135 (9th Cir. 1998) (quoting 5 U.S.C. § 702).

21  "Where the court is conducting judicial review pursuant to the APA, summary judgment is

22  the appropriate mechanism for determining the legal issue of whether the agency could have

23  reasonably have found the facts as it did." League of Wilderness Defenders-Blue Mountain

24  Biodiversity Project v. Bosworth, 383 F. Supp.2d 1285, 1292 (D.Or. 2005) (citing Occidental

25  Engineering Co. v. Immigration and Naturalization Service, 753 F.2d 766, 770 (9th Cir.

26  1985)).  Under the APA, an agency's decisions may be set aside only if "arbitrary, capricious,

27  an abuse of discretion, or otherwise not in accordance with the law." Mt Graham Red

28  Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993). "The arbitrary and capricious standard

1   is 'highly deferential, presuming the agency action to be valid and [requires] affirming the

2   agency action if a reasonable basis exists for its decision.'" Kern County Farm Bureau v.

3   Allen, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting Indep. Acceptance Co. v. California, 204

4   F.3d 1247, 1251 (9th Cir. 2000). In determining whether an agency's actions are arbitrary and

5   capricious, the court "must consider whether the decision was based on a consideration of

6   the relevant factors and whether there has been a clear error or judgment." Marsh v. Oregon

7   Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851 (1989)). Review under this

8   standard is to be "searching and careful," but remains "narrow," and a court is not to

9   substitute its judgment for that of the agency." Id. Deference is especially appropriate where

10  the challenged decision implicates substantial expertise. Ninilchik Traditional Council v.

11  United States, 227 F.3d 1186, 1194 (9th Cir. 2000) (citing Mt. Graham Red Squirrel, 986 F.2d

12  at 1571)). "Deference to an agency's technical expertise and experience is particularly

13  warranted with respect to questions involving engineering and scientific matters." United

14  States v. Alpine Land Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989). Unlike substantive

15  challenges; however, a court's review of an agency's procedural compliance is exacting, yet

16  limited. Kern County, 450 F.3d at 1076 (citations omitted). The court is to review such

17  challenges de novo but is limited to ensuring that "statutorily prescribed procedures have

18  been followed." Id.

19  **IV        Issues Raised**

20      Plaintiffs challenge the Defendants actions governing the BRLE asserting violations of

21  NEPA and FLPMA. With respect to NEPA, Plaintiffs argue that Defendants violated the Act

22  by: (1) failing to adequately consider reasonably foreseeable environmental impacts; (2)

23  failing to consider all reasonable alternatives to the BRLE; and (3) failing to prepare an

24  Environmental Impact Statement (EIS). As to FLPMA, Plaintiffs assert that Defendants

25  violated the Act by: (1) failing to demonstrate that the BRLE is in the public interest; (2)

26  violating Section 206(b) of the Act because of the possibility of disparate market value

27  between the federal and non-federal land.

28  **V.        Analysis**

**A.      Challenges to the BRLE Pursuant to NEPA**

**(1) Alleged Failure to Consider Reasonable Foreseeable Environmental Impacts**

As discussed by Defendants, NEPA requires that an Environmental Impact Statement (EIS) be prepared for "all major Federal actions significantly affecting the ... human environment." 42 U.S.C. § 4332(2)(C); <u>see also</u> <u>City of Davis v. Coleman</u>, 521 F.2d 661, 673 (9th Cir. 1975).  However, as the Forest Service did here, in certain circumstances, the federal agency may first prepare an environmental assessment (EA) to make a determination as to whether an EIS is necessary.[1]  40 CFR § 1501.4.  If the EA establishes that the agency's actions "may have a significant effect upon the environment, an EIS must be prepared." <u>Nat'l Parks & Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 730 (9th Cir. 2001), *cert denied*, 534 U.S. 1104 (2002) (citations omitted).  If the EA establishes that agency's actions will not have a significant effect then the agency must issue a Finding of No Significant Impact (FONSI) accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant. <u>Id.</u> (citing <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998)).  Whether an EIS or EA is prepared, the agency must take a "hard look" at the potential environmental impact of a project.  <u>Save the Yaak Committee v. Block</u>, 840 F.2d 714, 717 (9th Cir. 1988).  "This includes considering all foreseeable direct[2] and indirect impacts.[3]" <u>Idaho Sporting Congress, Inc., v. Rittenhouse</u>, 305 F.3d 957, 973 (9th Cir. 2002).

---

[1] An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 CFR § 1508.9.

[2] Direct effects are caused by the action and occur at the same time and place. 40 CFR § 1508.8(a).

[3] Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 CFR § 1508.8(b).

Plaintiffs challenge the Defendants' actions by arguing that the EA II prepared by the Forest Service is inadequate because it fails to fully evaluate the reasonably foreseeable environmental impacts of the BRLE.  Plaintiffs pay particular attention to the possible future development of the federal owned property once the BRLE is finalized and the federal land becomes non-federal property.  In other words, Plaintiffs challenge whether the Forest Service took the requisite "hard look" at the impacts of the BRLE before approving the transaction.

### (a) Forest Service's Alleged Failure to Sufficiently Evaluate Future Development

Plaintiffs assert that the Forest Service failed to evaluate the environmental impact of the development of the federal land exchanged in the BRLE.  (Dkt.#15, pp.6-8).  Plaintiffs take specific issue with the Forest Service's citation to and reliance upon applicable local and state laws and regulations that would govern any development of the federal land.  Plaintiffs argue that such broad reliance on state and local regulations does not meet the Forest Service's obligation to take a "hard look" at the potential environmental impact of the development of the federal land.  In addition, Plaintiffs take issue with the Forest Service's alleged failure to take the requisite "hard look" at the environmental impact in the event that development of the federal land occurred consistent with a well-recognized loophole in Arizona law, referred to as "wildcat" development.[4]

Defendants; however, take exception to the Plaintiffs' argument that Defendants simply defaulted to the state and local regulations when evaluating any environmental impact from the development of the federal lands.  (Dkt.#23, pp.7-9).  Defendants argue that their obligation to evaluate the development of the land was met.  First, Defendants note that the proponent of the land exchange, Mr. Owens, stated he had no plans to develop the federal

---

[4]According to Defendants, "wildcat" development is a current loophole in Arizona law, which limits counties ability to regulate parcels split into five or fewer lots.  Such developments create the possibility of one large lot being split between five owners who then engage in additional splits that go unregulated which creates the possibility of unregulated water use in such areas. (AR 211).

1    land. (AR 18, 32 at 2).   More importantly, according to the Defendants, the Forest Service

2    still went ahead and analyzed and evaluated the potential environmental impacts of such

3    development of the federal land.  (AR 187).  In performing this evaluation, the Defendants

4    contend that the Forest Service assumed the maximum amount of legal development would

5    occur on the federal land. Defendants also assert that while the possibility of "wildcat"

6    development was recognized, the environmental impact regarding such development was

7    properly discounted.

8         In the Court's view, as a general matter, the Forest Service did not act in an "arbitrary and

9    capricious" manner  by forecasting the impact of development of the federal land with the

10   aid of local and state regulations. A full reading of EA II demonstrates that the Forest Service

11   evaluated the development of the federal land and the effects, to at least a material extent, of

12   such development upon the federal land.  (AR 187).  For instance, EA II goes through the

13   impact of development of the federal land and its impact with respect to water quality (Id.

14   at 19-20), scenic quality (AR Id. at 21), wildlife (Id. at 25-26), soil and air (Id. at 28),

15   heritage resources (Id. at 30), wetlands and flood plains (Id. at 33), and social and economic

16   factors (Id. at 34-35). EA II also provided a summarizing cumulative effects analysis of such

17   development. (Id. at 55-57).  EA II's findings regarding possible future development was

18   derived, at least in part, from the "Evaluation and Estimate of Projected Development Costs

19   for Subdivision of 337 Acres in Greer, Apache County, Arizona. (AR 187 at 14, and AR

20   113).  This report was prepared by the Murphy Engineering Group and addressed the cost

21   of development of such land.  The Forest Service assumed minimum lots sizes of one acre

22   as required in the Greer, Arizona area. (AR 187 at 14-15).  In many of the instances, as

23   Plaintiffs point out, the Forest Service stated and assumed development of the lands would

24   be in conformance with the applicable local and state regulations; such as air quality, sewer

25   and water use.  (AR 187).  However, the Court does not find general fault with such

26   assumptions in making a determination as to the potential impact of future development of

27   the land.

28

1   While the Court does not find general fault with the Forest Service's citation to and

2   reliance upon applicable state and local laws in forecasting the impact to the environment in

3   the event of development of the federal land, the Court does find that the Forest Service

4   failed to take the requisite "hard look" at well-recognized scenarios that would potentially

5   deviate from the Forest Service's development scenario. Most notably, is the Forest Service's

6   decision to recognize but not consider the impact to the environment in the event that

7   "wildcat" development occurred, which, more importantly, would potentially result in

8   multiple additional shallow wells on the federal land. This determination is exemplified by

9   the Appeal Reviewing Officer's decision approving the BRLE. (AR 223). In the decision,

10   the officer expressly recognized the possibility of "wildcat" development on the federal land

11   with the potential for multiple "individual shallow wells"; however, the officer found the

12   findings of the EA II to be sufficient by citing in pertinent part:

13   ...It is possible that extensive development of existing and any new shallow ground
     water wells... could have an effect on other shallow wells. The extent of the effect, if
14   any, is speculative and uncertain.
     (Id.; AR 187, p.19).

15   In this Court's view, simply recognizing the possibility of multiple shallow wells on the

16   federal land and failing to attempt any meaningful investigation into the resulting impact to

17   existing water wells and the overall water supply demonstrates that the Forest Service failed

18   to take the requisite "hard look" at this issue. For instance, there is no indication that the

19   Forest Service was not able to forecast the impact of a scenario involving the addition of

20   multiple shallow wells on the federal land. Rather, the record demonstrates that the Forest

21   Service left the issue substantially unaddressed and relied entirely on its development

22   scenario of the federal land that consisted of only one deep well. (AR 185, 187). Thus, while

23   the Forest Service acknowledged the possibility of "wildcat" developments on the federal

24   land resulting in a development scenario of multiple "shallow wells" rather than one deep

25   well, there is no credible analysis regarding the impact such wells would have on the water

26   supply on the federal land and neighboring lands. The Forest Services' failure to perform any

27   such analysis rises to the level of an "arbitrary and capricious" decision and violates their

28

obligations under NEPA in preparation of the EA II.[5] Support for this determination can be found in the Ninth Circuit's decision in <u>City of Davis</u>, 521 F.2d 661 (9th Cir. 1975), which involved a challenge by the City of Davis against the Secretary of Transportation in conjunction with the Division of Highways of California regarding a proposed freeway interchange just north of the City of Davis.  In reversing the lower court, the Ninth Circuit held that the Secretary and Highway Division violated NEPA considerations by failing to prepare a "secondary" environmental effects[6] evaluation regarding the environmental impact of the project.  <u>Id.</u> at 676.  Notably, in response to the Division of Highway's position that such an evaluation was not required because of uncertainty of any development, the Ninth Circuit concluded in pertinent part:

> It is true that the development potential which the interchange will create comprehends a range of possibilities.  The ultimate outcome will depend on the plans of private parties and local government outside the direct control of state and federal government.  In this context the purpose of an EIS/EIR is to evaluate the possibilities in light of current and contemplated plans and to produce an informed estimate of the environmental consequences.  That the exact type of development is not know is not an excuse for failing to file an impact statement at all.  Uncertainty about the pace and direction of development merely suggests the need for exploring in the EIS/EIR alternative scenarios based on these external contingencies.  Drafting an EIS/EIR necessarily involves some degree of forecasting.
> <u>Id.</u>

Although the discussion in <u>City of Davis</u> involves a situation regarding the necessity of an EIS, the rationale of the Ninth Circuit is instructive in demonstrating that the Forest Service did not take the requisite "hard look" in the EA II at the environmental impact to the federal and neighboring lands in the event of development.  Similar to the argument advanced by the defendants in <u>City of Davis</u>, the Forest Service asserts that development of the federal land that could potentially result in the implementation of multiple shallow wells

---

[5]The possibility of multiple additional shallow wells versus one deep well on the federal property is bolstered by the July 24, 2003 letter from the non-federal landowner, Mr. Owens, which concluded that "the costs for pumping the water from such depths and converting adequate volumes to potable quality are essentially prohibitive." (AR 105).

[6]The "secondary" environmental effects discussed in <u>City of Davis</u>, appears to be equivalent to an EIS.

1   rather than one deep well is speculative and thus the Forest Service was not obligated to take

2   a "hard look" at this issue.  However, as rejected by the Ninth Circuit in <u>City of Davis</u>, this

3   argument is not persuasive as the Forest Service must not only look at the development

4   scenario it believes most applicable, but also other reasonably foreseeable scenarios with

5   potentially differing environmental impacts.  The Forest Service recognized a development

6   scenario consisting of multiple shallow wells, but simply deferred any environmental

7   analysis on the issue by determining such to be speculative.  In this Court's view, such a

8   determination does not comply with the Forest Service's obligation to take the requisite "hard

9   look" at the potential environmental impacts of such a project.  Thus, the Forest Service's

10  failure to take a "hard look" at this issue in the EA II rises to the level of "arbitrary and

11  capricious."

12                    **(2) Alleged Failure to Consider Reasonable Alternatives**

13      Plaintiffs further contend that the Defendants violated NEPA considerations by failing to

14  consider all reasonable alternatives to the BRLE.  <u>See</u> 40 C.F.R. § 1502.14.  For instance,

15  Plaintiffs assert that Defendants did not give proper consideration to alternatives such as

16  imposing deed restrictions on the federal land or simply purchasing the non-federal land

17  outright.  Plaintiffs cite the Court's attention to the Ninth Circuit's holding in <u>Muckleshoot</u>

18  <u>Indian Tribe v. U.S. Forest Service</u>, 177 F.3d 800 (1999).  In <u>Muckleshoot</u>, the Ninth Circuit

19  held that the Forest Service, involved in a land exchange with a private party, violated NEPA

20  considerations where it failed to consider feasible alternatives to the proposed land exchange

21  such as deed restrictions on the federal land or decreasing the amount of land exchanged.

22  <u>Id.</u> at 813-14.

23      Defendants take exception to Plaintiffs' argument with respect to Defendants alleged

24  failure to consider all reasonably foreseeable alternatives to the exchange.  Defendants cite

25  the Court's attention to the DN II and FONSI II, which expressly addresses the available

26  alternatives such as deed restrictions or purchasing the private land outright.  (AR 189, pp.

27  7-8).  <u>See</u> <u>Citizens for a Better Henderson v. Hodel</u>, 768 F.2d 1051, 1057 (9th Cir. 1985)

28

1   ("[v]iable but unexamined alternative renders [the] environmental impact statement
2   inadequate.").

3       The Court agrees with Defendants that Plaintiffs' argument with respect to the proper
4   consideration of available alternatives is without merit.  Most notably, unlike the situation
5   in Muckleshoot, the Defendants did analyze reasonable alternatives such as deed restrictions
6   and the outright purchase of the land.  For instance, with respect to the alternative of deed
7   restrictions on the federal land, the Defendants evaluated but rejected the possibility based
8   upon several factors.  For instance, the Forest Service noted that the federal land did not
9   possess critical habitat and did not touch on riparian areas, wetlands or floodplain.  In
10  addition, the Forest Service noted that its policy has long called for state and local
11  governments to address zoning and regulation of uses of land. While Plaintiffs may disagree
12  with the rationale in declining to entertain this alternative, there can be no doubt that the
13  alternative was properly considered.  In Plaintiffs' Reply brief, Plaintiffs compare the Forest
14  Service's conduct in this case to that of another land exchange in 1999, referred to the Ricks
15  College exchange in Idaho.  Plaintiffs' note that in the Ricks College exchange the Forest did
16  engage in a land exchange with a private party and retained development rights for a
17  common area of the conveyed federal land.  However, the Court finds that Plaintiffs' reliance
18  on the Ricks College exchange provides no support for their position.  The Ricks College
19  exchange is an entirely different transaction that occurred years prior to the instant BRLE.
20  The fact that Forest Service may have engaged in a land exchange with deed restrictions
21  previously certainly does not mandate that such a restriction exist in this case.

22      In addition, the Forest Service provided sufficient consideration to the possibility of
23  purchasing the non-federal land. For instance, the Forest Service noted that the Land and
24  Water Conservation Fund ("LWCF") provides only a limited amount of money for the
25  "highest national priorities for land acquisition." (AR 189 p.7). Moreover, the Forest Service
26  noted that Mr. Owens had previously related his unwillingness to sell the non-federal lands
27  to the Federal government outright, because of his intention to acquire lands with equal
28  value.  (Id).  Despite these considerations weighed by the Forest Service in rejecting the

1  purchase of the non-federal lands, Plaintiffs contend that the Forest Service's conduct was

2  not in compliance with their obligation under NEPA.  For instance, Plaintiffs note that

3  Defendants did not even  identify a potential funding source for the purchase of the non-

4  federal land.  Moreover, Plaintiffs note that there are currently two acquisitions budgeted for

5  fiscal year 2007 involving the purchase of non-federal land.  The Court; however, does not

6  find these arguments persuasive.  For instance, contrary to Plaintiffs' argument, the Forest

7  Service did identify and consider the LWCF as a potential source of funding for the purchase

8  of the non-federal land. (Id).  However, the Forest Service discounted the possibility based

9  upon two factors.  First, that funds under the LWCF were not available for the purchase.

10  Second, the non-federal land owner, Mr. Owens, had already indicated that he would not

11  engage in such a transaction with the Forest Service.  In addition, Plaintiffs' reliance on the

12  2007 fiscal year budget is not persuasive.  Contrary to Plaintiffs' argument, it appears that the

13  two proposed land purchases in Arizona for 2007 have been rejected in Congress, thus

14  supporting the statement in the DN II and FONSI II that "land purchases will continue to be

15  limited in the foreseeable future as funding is now in a downward trend." (Id).

16  In sum, the Court finds that the Forest Service did comply with its obligation under NEPA

17  standards in considering and weighing the appropriate reasonable alternatives to the BRLE.

18  ### (3) Alleged Failure to Prepare an EIS

19  Plaintiffs further contend that the Forest Service violated NEPA with its determination not

20  to prepare an EIS regarding the BRLE.  Plaintiffs rely primarily on the Defendants' alleged

21  failure to consider the impact to water resources of the federal and surrounding lands should

22  the federal land be developed in connection with the implementation of "wildcat"

23  subdivisions.[7]  Conversely, Defendants contend that because the Forest Service reasonably

24

25  ───────────────

26  [7]The Court previously determined that Defendants violated their obligation under
NEPA considerations by not taking a "hard look" at the environmental impact resulting in
27  a development scenario consisting of multiple shallow wells in the context of the EA II.  The
issue before the Court now is whether Defendants should have prepared an EIS addressing
28  this issue.

1  concluded that the BRLE would not result in significant environmental effects, the Agency

2  was not required to prepare an EIS.

3    Section 102(C) of NEPA requires that an EIS be prepared in connection with "major

4  Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

5  4332(2)(C).  This requirement serves two purposes: (1) "[i]t ensures that the agency, in

6  reaching its decision, will have available, and will carefully consider detailed information

7  concerning significant environmental impacts" and (2) "it also guarantees that the relevant

8  information will be made available to the larger audience that may also play a role in both

9  the decisionmaking process and the implementation of that decision." Friends of the

10  Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000) (citing Robertson v. Methow

11  Valley Citizens Council, 490 U.S. 332, 349 (1989)).  "Stated differently, NEPA's purpose is

12  to ensure that 'the agency will not act on incomplete information, only to regret its decision

13  after it is too late to correct.'"  Id. (citation omitted). "Whether there may be a significant

14  effect on the environment requires consideration of two broad factors: context and intensity."

15  National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001), cert

16  denied, 534 U.S. 1104 (2002).  "Context simply delimits the scope of the agency's action,

17  including the interests affected." Id.  "Intensity relates to the degree to which the agency

18  action affects the locale and interest identified in the context part of the inquiry." Id.   In

19  evaluating the "intensity" element, multiple scenarios provide probative value including

20  "[t]he degree to which the possible effects on the human environment are highly uncertain

21  or involve unique or unknown risks." 40 CFR § 1508.27(b)(5).  If an EA establishes that the

22  agency's actions "may have a significant effect upon the environment, an EIS must be

23  prepared." National Parks 241 F.3d at 730.  "An agency's decision not to prepare an EIS will

24  be considered unreasonable if the agency fails to supply a convincing statement of reasons

25  why potential effects are insignificant." Blue Mountain Biodiversity Project v. Blackwood,

26  161 F.3d 1208, 1211 (9th Cir. 1998). To prevail on a claim that the agency violated its duty

27  to prepare an EIS, a plaintiff need not show that significant effects will in fact occur. It is

28

sufficient for a plaintiff to raise substantial questions whether a project may have a significant effect. Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998).

The Court agrees with Plaintiffs that Defendants decision not to prepare an EIS regarding the impact upon the environmental resources of the federal land and surrounding lands in the event development is "arbitrary and capricious."  As noted above, in approving the BRLE, the Forest Service acknowledged the possibility of multiple additional shallow wells on the federal lands, rather than the scenario of using only one deep well. (AR 187, p.19; 223, p.3). However, rather than investigate the impact that multiple additional shallow wells would have on the federal and neighboring land, the Forest Service dismissed it in its EA II's by finding that:

> It is possible that extensive development of existing and any new shallow ground water wells... could have an effect on other shallow wells.  The extent of the effect, if any, is speculative and uncertain.

(AR 187, p. 19).

While the Forest Service recognized the possibility of multiple shallow wells on the federal land, it determined that an analysis of the environmental impact of such wells was simply not necessary.  The extent of the Forest Service's analysis focused only on the impact of one deep well should development occur.  For instance, the Geological Resources Report prepared by Mark Schwab provided an evaluation regarding the impact to the water supply in the event that a 200 gallon per minute well is implemented on the federal land.  (AR 185, p.10).  In the event that such a well is implemented, Mr. Schwab concluded that there would be minimal impact to the overlying volcanic and White Mountain aquifers.  (Id. p.11). Despite the Forest Service's acknowledgment of the possibility of shallow wells in the EA II, appearing on the federal land, Mr. Schwab did not evaluate the impact of the multiple shallow wells.  In this Court's view, the Forest Service's decision to simply dismiss the environmental affects as "speculative and uncertain" does not meet the Forest Service's obligation "to supply a convincing statement of reasons why potential effects are insignificant."  Blue Mountain 161 F.3d at 1211 see also City of Davis, 521 F.3d at 676 (holding that because exact type of development is not known is not an adequate excuse

1   justifying decision not to prepare impact statement).    Moreover, the Court finds that

2   sufficient "substantial questions" were raised as to suggest that these shallow wells may have

3   a significant environmental impact.   Idaho Sporting, 137 F.3d at 1150.  The Forest Service

4   even acknowledged the effect in the EA II.  (AR 187, p.19).

5       In making this determination, the Court rejects Defendants' argument that an EIS was not

6   necessary.  First, Defendants' note that the standard regarding the effects  of a review of

7   proposed projects "do[es] not anticipate the need for an EIS anytime there is uncertainty, but

8   only if the effects of the project are 'highly' uncertain." Environmental Protection Information

9   Center v. United States Forest Service, 451 F.3d 1005, 1011 (9th Cir. 2006); see also 40 CFR

10  § 1508.27(b)(5).  Defendants argue that Plaintiffs have failed to meet their burden that "they

11  must show impacts are 'highly' uncertain such that there may be a significant effect on the

12  environment." (Defendants' Reply, p.9).  This argument fails; however, because it cannot be

13  said the effects of the existence of multiple shallow wells on the federal land does not

14  generate impacts that are "highly uncertain."   Relevant distinguishing and analogous

15  authority supports the Court's determination.  For instance, in Environmental Protection, 451

16  F.3d at 1011, the Ninth Circuit held that the Forest Service's determination not to issue an

17  EIS regarding the impact to the spotted owl resulting from a proposed land transaction was

18  sound.  The Ninth Circuit noted that while the EA noted uncertainty resulting from the

19  proposed timber sale on federal land to the owls, the report also disclosed that the "density

20  of owls in the project area should be roughly constant." Id.  In other words, the report noted

21  that there was specific uncertainty as to the distribution of owls, but that the population of

22  the owls would not likely be impacted regardless of the uncertainty.  Id.  The instant case is

23  distinguishable from the situation in Environmental Protection.   For instance, unlike

24  Environmental Protection, there is uncertainty as to the overall impact to the protected

25  element, in this case the water supply.  The Forest Service has acknowledged the overall

26  uncertainty, but has simply left the question regarding the impact to the environment open

27  to debate and substantial uncertainty.

28

1    Analogous authority demonstrating the Forest Service's obligation to prepare an EIS is

2    found in <u>National Parks</u> 241 F.3d 722.  In <u>National Parks</u>, the Ninth Circuit determined that

3    the federal agency, the Parks Service, erred with its determination not to issue an EIS

4    regarding a proposal to increase the number of cruise ships into the Glacier Bay National

5    Park, located in the Alaskan panhandle.  This decision was based, in part, upon the high level

6    of uncertainty surrounding the impact that the proposed changes would have on the

7    surrounding ecosystem.  <u>Id.</u> at 731-734. For instance, the EA prepared by the Parks Service

8    related that there was little information about the effects of the proposed changes to the

9    stellar sea lions, a protected species, as well as other animal populations. <u>Id.</u> at 732. The EA

10   also noted it was unknown to what extent the increase air pollution would diminish the

11   beauty and quality of  the natural environment.  <u>Id.</u>  More importantly, the EA cited these

12   uncertainties while at the same time noted that the information was both obtainable and

13   helpful. <u>Id.</u>  Thus, because the extent of the injury to the environment was unknown, the

14   Parks Service decision not to perform an EIS was error.

15   <u>National Parks</u> is analogous to the instant case.  For instance, like <u>National Parks</u>, the EA

16   II  acknowledges the potential threat or impact to the environment by noting the potential

17   impact to the water supply should multiple additional shallow wells be developed. (AR 187,

18   p.19).  Moreover, like <u>National Parks</u>, although the impact is acknowledged, the question of

19   the extent of the impact is simply left open.  The Forest Service left the question open by

20   stating that the "extent of the effect, if any, is speculative and uncertain." (Id.).  Finally, it is

21   important to note that although the Forest Service concluded that the extent of the effect was

22   "speculative and uncertain" it made no indication in the EA II that it would not be possible

23   to evaluate or forecast the potential impact to the water supply on the federal and neighboring

24   lands in the event that development occurred resulting in multiple additional shallow wells.

25   In addition, the Court does not find persuasive the Defendants' position that the context

26   of Plaintiffs' argument is misplaced. Defendants assert that "the uncertainty is largely over

27   the extent of possible development and not over the effects that might result from such

28

1   development." (Defendants' Response, p.17).   However, this argument ignores the plain

2   language of the EA II which found the uncertainty to be based upon the "[t]he extent of the

3   effect" not on the extent of development cited by Defendants.  (AR 187, p. 19).

4       Thus, the Court rejects Defendants' argument that the uncertainty surrounding the extent

5   of the impact resulting from development of the federal land and multiple additional wells

6   does not rise to the level of "highly uncertain" justifying the preparation of an EIS.  The

7   Forest Service focused its study only on the results to the environment in the event one deep

8   well was used to support development.   However, at the same time the Forest Service

9   acknowledged the possibility of additional new shallow ground water wells and their

10  potential impact but left the question unaddressed.  Because the extent of the impact of such

11  wells is "highly uncertain" the Forest Service was required to prepare an EIS, thus making

12  the decision not to "arbitrary and capricious."

13  **B.      Challenges to BRLE Pursuant to the FLPMA**

14          **(1) Forest Service's Alleged Failure to Consider the Public Interest**

15  Plaintiffs also assert that the Forest Service violated the FLPMA by not properly

16  determining the BRLE to be in the public interest pursuant to 43 U.S.C. § 1716(a).

17  Defendants, conversely, assert that the Forest Service did properly evaluate the BRLE and

18  the public interest associated with the BRLE and properly exercised its discretion.

19  43 U.S.C. § 1716(a) provides in pertinent part:

20  A tract of public land or interests therein may be disposed of by exchange by the
    Secretary [of the Interior]... where the Secretary concerned determines the public
21  interest will be well served by making that exchange: *Provided*, That when considering
    public interest the Secretary concerned shall give full consideration to better Federal
22  land management and the needs of State and local people, including needs for lands for
    the economy, community expansion, recreation areas, food, fiber, minerals, and fish
23  and wildlife and the Secretary concerned finds that the values and the objectives which
    Federal lands or interests to be conveyed may serve if retained in Federal ownership
24  are not more than the values of the non-Federal lands or interests and the public
    objectives they could serve if acquired.
25

26  Plaintiffs raise three examples of the Forest Service's alleged failure to consider the public

27  interest before approving the BRLE: (1) the needs of state and local residents were not

28  properly considered;  (2) the potential impact to the Greer area's aesthetic features and

1  wilderness should the federal land be privatized; and (3) the loss of recreation opportunities
2  and public access to such recreational opportunities.

3      However, after reviewing the record, the Court does not find the Plaintiffs' argument on
4  this issue persuasive.  Rather, although Plaintiffs disagree with the Forest Service's
5  determination that the BRLE will serve the public interest; that fact is not dispositive.  This
6  Court's review is limited to whether the Forest Service properly evaluated the public interest
7  and considered the relevant factors surrounding the BRLE.  In response to Plaintiff's specific
8  contentions, the Court finds that these factors were sufficiently considered and encompassed
9  within in the Forest Service's determination.  For instance, the benefits of the proposed land
10  exchange are well documented as the private land appears to possess valuable resources such
11  as additional wetland/riparian habitat as well as vital habitat species. (AR 189, p.3).
12  Moreover, the acquisition of the non-federal land appears to provide for better and more
13  efficient land management resulting from land consolidation. (Id. p.4).  In addition, the
14  BRLE would not appear to have any adverse affect to property values.  (Id.).  Finally,
15  recreational concerns were also addressed by the Forest Service.  For instance, in EA II, the
16  Forest Service noted the impact to recreational opportunities by the loss of 337.74 acres of
17  the current 14,227 acres of Federal land within the Greer Recreational area, which is made
18  up of 16,939 acres. As such, in sum, there would be only a 2.4% reduction of the Federal
19  land within the Greer Recreation area.  (AR 187, pp.37-38).

20      Thus, although the Plaintiffs may disagree with the Forest Service's determination that the
21  BRLE serves the public interest, the Court finds that the Forest Service adequately
22  considered the relevant factors of 43 U.S.C. § 1716(a) as well as addressed the relevant
23  concerns raised by the BRLE.  As such, the Forest Service did not act in an "arbitrary and
24  capricious" manner in determining the BRLE to be in the public interest.

25      **(2)      Forest Service's Failure to Properly Evaluate Property Values**

26      Lastly, Plaintiffs raise several challenges to the Forest Service's valuation of the federal
27  and non-federal lands.  This challenge is relevant because 43 U.S.C. § 1716(b) requires that
28  the market valuation for lands exchanged be within 25% of each other.   Plaintiffs assert that

1    the valuation of the non-federal land is flawed as the data used was a product of transactions

2    that were not conducted at arm-length.  In addition, Plaintiffs assert that the valuation of the

3    federal land is flawed and likely too low based upon the appraiser's failure to consider recent

4    sales of large parcels in the Greer area as well as a land exchange in the Greer area occurring

5    in 1994.  Conversely, Defendants assert that the appraiser's valuation is well-analyzed and

6    the fact that Plaintiffs may disagree with the appraiser's determination does not provide

7    sufficient basis suggesting that the appraisal was "arbitrary and capricious."

8        After reviewing the record, the Court finds itself in agreement with Defendants, in part,

9    and Plaintiffs, in part, on this issue.  As a general matter, the expertise administered in

10   rendering the appraisal is subject to deference. See Ninilchik Traditional, 227 F.3d at 1194

11   (9th Cir. 2000) (noting that deference is appropriate were the challenged decision implicates

12   substantial expertise).  For instance, the Court does not find merit in Plaintiffs' argument that

13   the valuation of the non-federal land was tainted by the appraiser's citation and reliance upon

14   previous transactions involving the private landowner, Mr. Owens, based upon the possibility

15   that such transactions were not conducted at arms-length. Plaintiffs assert that it was error

16   for the appraiser to rely upon such transactions as the non-federal land owner, Mr. Owens,

17   may have inflated the purchase price of such transactions to drive up the value of the non-

18   federal land.  However, as noted by Defendants, there does not appear to be any evidence of

19   some sort of guarantee by the Forest Service that it would engage in the land exchange with

20   Mr. Owens prior to entering the transactions at issue.  Rather, Plaintiffs' argument appears

21   to be premised on speculation which is insufficient to demonstrate any type of issue.

22       Moreover, the Court does not find persuasive Plaintiffs' argument that the appraiser failed

23   to properly consider the Hidden Meadow guest ranch property in valuing the federal land.[8]

24   The Hidden Meadow property is located just north of Greer and sold for $5,000,000 in

25   December of 2000.  Plaintiffs argue that although the appraiser evaluated the property its

26

27       [8]As noted by the parties, Tract A of the federal land, consisting of 69.95 acres, was
     valued at $804,425, or $11,500 per acre. (AR 114, p.81).  Tract B of the federal land,
28   consisting of 267.25 acres, was valued at $3,875,125, or $14,500 per acre. (Id. p.85).

1    decision not to consider it was error, especially because even in making a generous allocation

2    of $1,000,000 for the structural improvements, the land itself would still demand a value of

3    $4,000,000, or $27,000 per acre.  However, in reviewing the appraisal report, it appears that

4    the land was properly considered by the appraiser with the ultimate determination that it was

5    not instructive to the appraisal.  Specifically, the appraiser noted multiple issues complicating

6    the ability to gauge an accurate value to the property.  For instance, the appraiser explained

7    that the property consisted of a significant amount of existing improvements and  the sale of

8    the property was contingent upon plat approval of two different subdivisions on the property.

9    The appraiser concluded that there had been "no segregation of the purchase price...between

10   the land, the substantial amount of existing building and site improvements, the business

11   value of the existing guest ranch operation, and the benefit associated with the preliminary

12   plat contingency."  (AR 114, p.10).  Because of these considerations a reliable land value

13   could not be derived.  Clearly, the Plaintiffs disagree with the appraiser's determination on

14   this issue; however, the issue before the Court is whether such a decision is "arbitrary and

15   capricious."  In light of the scientific nature and degree of expertise involved in generating

16   the appraisal the Court finds that this determination is subject to deference and does not

17   demonstrate a violation of the FLPMA in determining the land values for the federal lands.

18       However, even though the appraiser is subject to deference, as noted above, with respect

19   to the Hidden Meadow property, this determination is largely based upon the fact that the

20   property was properly considered and then discounted from evaluation based upon the

21   exercise of the appraiser's expertise.  The same cannot be said regarding the appraiser's

22   handling and evaluation of the information regarding a 1994 land exchange involving federal

23   property in the Greer area.  The 1994 land exchange also involved two tracts of federal land;

24   the first parcel was 70.39 acres and valued at approximately $14,000 per acre and the second

25   parcel was 76.2 acres and valued over $14,000 per acre. (PSOF ¶ 52; Exhibit 1 to PSOF -

26   July 21, 2003 letter from Edwin Biggers).  The Parties agree that information regarding the

27   1994 land exchange was forwarded to the appraiser for review.  However, Plaintiffs assert

28   that although the information regarding the 1994 exchange was disclosed to the Forest

1   Service and appraiser there is nothing to suggest that it was even considered in valuing the

2   federal land.  Moreover, Plaintiffs argue that there can be no doubt that the value of the land

3   in the Greer area has risen materially over the years, contrary to the appraiser's valuation.

4      Based upon a review of the record, the Court finds the appraiser's omission of any

5   reference of the 1994 land exchange to be puzzling.  The letter from the Forest Service to the

6   appraiser on August 29, 2003 expressly requested the appraiser to "use [its] discretion and

7   professional judgment in deciding how and/or to what extent [it felt] appropriate in analyzing

8   or utilizing [the] data." (AR 112).  In addition, the Forest Service requested that appraiser

9   "acknowledge and document [its] <u>consideration</u> of the additional market based data in [its]

10  appraisal report." (Emphasis original) (Id.).   In spite of this request, there is no indication

11  in the record that the appraiser gave this information due, if any, consideration.  In other

12  words, while the appraiser may have received it, based upon the omission of any reference

13  in the report, it appears the information may not have been considered.  The Court finds that

14  such a possibility raises a material question regarding the current appraised values of the

15  federal land as the results of the 1994 exchange raise some legitimate questions.  For

16  instance, the land values of the federal land in the 1994 land exchange are nearly the same

17  as the land value of Tract B of the current land exchange, thus suggesting that the land values

18  in the Greer area have surprisingly remained consistent over the past decade plus period of

19  time.  However, rather than address that question in the appraisal, the question is

20  unfortunately left unaddressed.  While the Court must afford discretion to the expertise of

21  the appraiser, the Court's discretion only extends to the extent that there is a reasonable and

22  rationale explanation addressing legitimate questions and issues associated with the appraisal.

23  Here, no such answer is supplied.  Given the potentially material nature of the 1994 land

24  exchange, its complete omission from the appraisal of the current land exchange, is "arbitrary

25  and capricious."

26  **VI.      Remand**

27     At oral argument, the Parties agreed that in the event the Court found approval of the

28  BRLE to be flawed in any respect, that remand to the Forest Service would be the appropriate

1   remedy.  As noted above, the Court has found the approval of the BRLE to be "arbitrary,

2   capricious, and otherwise not in accordance with law," in violation of NEPA and FLPMA

3   with respect to: (1) the Forest Service's failure to take the requisite "hard look" in the EA II

4   at the environmental impact should the federal land be developed with the use of multiple

5   shallow wells rather than one just one deep well, such as with "wildcat" development; (2) the

6   Forest Service's decision not to prepare an EIS evaluating the environment impact of the use

7   of multiple shallow wells should the federal land be developed; and (3) the Forest Service's

8   failure to fully evaluate and/or explain the significance of the 1994 land exchange in Greer

9   in the valuation of the federal property.   In light of these findings, the Court will direct the

10  Parties to meet and confer and submit a proposed form of order detailing the issues to be

11  addressed on remand.

12      **Accordingly,**

13      **IT IS HEREBY ORDERED** granting in part and denying in part Plaintiffs' Motion for

14  Summary Judgment (Dkt.#15).

15      **IT IS FURTHER ORDERED** granting in part and denying in part Defendants' motion

16  for summary judgment. (Dkt.#23-2).

17      **IT IS FURTHER ORDERED** directing the Parties to meet and confer and submit a

18  proposed form of order detailing the scope of this Court's remand to the United States Forest

19  Service as well as the specific issues to be addressed.  The Parties are to meet and confer and

20  submit a joint proposed form of order within the next 14 days.  Should the Parties not be able

21  to reach an agreement on the scope of remand, the Parties are directed to submit their

22  respective positions with proposed forms of order addressing the remand within this time.

23

        DATED this 28th day of February, 2007.

24

25

26      _____

27                      Mary H. Murgula
                 United States District Judge

28